# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RIMAS PROPERTIES, et al., | : | |
|     Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| AMALGAMATED BANK, Individually | : | |
| and as Trustee of Longview Ultra | : | |
| Construction Loan Investment Fund, | : | No. 09-5779 |
|     Defendant. | : | |

Schiller, J.                                                                                                  August 3, 2010

## MEMORANDUM

Plaintiffs Rimas Properties LLC, Rimas Properties, LP, and Samir Benakmoume (collectively "Rimas") initiated a lawsuit seeking a declaratory judgment that Defendant Amalgamated Bank ("Amalgamated") violated Pennsylvania's Deficiency Judgment Act and requesting that Rimas be released from any further debt obligation to Amalgamated. Currently before the Court are the parties' cross-motions for summary judgment. For the reasons that follow, the Court will grant Amalgamated's motion and will deny Rimas's motion.

## I. BACKGROUND

Rimas Properties, LP is a Pennsylvania limited partnership and Rimas Properties, LLC, a Pennsylvania limited liability company, is its general partner. (Compl. ¶¶ 8–9; Answer ¶¶ 8–9.) Amalgamated is a commercial bank organized under the laws of New York, with its principal corporate offices in New York. (Compl. ¶ 11; Answer ¶ 11.) On or about September 2, 2005, Rimas borrowed thirty-three million dollars from Amalgamated, secured by a mortgage on a residential condominium complex known as "The Lofts," located at 1352 South Street in

Philadelphia, Pennsylvania. (Compl. ¶ 16; Answer ¶ 16.) Samir Benakmoume, a Pennsylvania citizen, was a guarantor of Rimas's obligations under the loan. (Compl. ¶ 10; Answer ¶ 10.)

In June of 2009, after Rimas defaulted on the loan by the extended maturity date, Amalgamated filed a confession of judgment in the Philadelphia Court of Common Pleas against Rimas and received a judgment for $28,496,782.72. (Compl. ¶¶ 19–20; Answer ¶¶ 19–20.) In August of 2009, Amalgamated filed a "Praecipe for Writs of Execution Upon Confessed Judgment" in the Philadelphia Court of Common Pleas and submitted for issuance twenty-three writs of execution to sell bundles of the condominiums at sheriff's sale. (Pl.'s Mot. for Summ. J. Ex. 4 [Defs. Resp. to Pls.' Interrogs.] ¶ 6.) Rimas claims that the units referenced in each writ are separate pieces of alienable real property that the bank arbitrarily bundled together for the sale or that each bundle represents a separate piece of real property owned by Amalgamated. (Compl. ¶¶ 22–23.) Amalgamated, on the other hand, contends that the Sheriff's instructions limited each writ to only five or six units, which is the standard method the Sheriff uses when selling properties in order to produce higher bids. (Def.'s Mot. for Summ. J. at 22.)

The Sheriff's sale took place on December 1, 2009, and the minimum bid on the first bundle was set at $9,400. Because there were no bids from other parties on this bundle, Amalgamated purchased it for the minimum amount. (Compl. ¶¶ 28–29; Answer ¶¶ 28, 34.) The Sheriff's office continued to auction off the bundles. Without seeking a deficiency judgment, Amalgamated proceeded to buy all of the remaining bundles at that one day auction proceeding, save one condominium, which was purchased by an independent buyer for $625,000. (Compl. ¶¶ 31–35; Answer ¶ 34.)

Rimas filed this lawsuit on December 4, 2009, seeking a declaratory judgment that

Amalgamated had violated the Pennsylvania Deficiency Judgment Act ("DJA"), 42 PA. CONS. STAT. § 8103(a), and that Rimas's debt obligation has been satisfied. On May 28, 2010, Amalgamated filed a petition for deficiency judgment in the Philadelphia Court of Common Pleas, and Amalgamated amended that petition on June 3, 2010. (Def.'s Mot. for Summ. J. at 4.) In the petition, Amalgamated asked the court to fix the value of the property it purchased during the Sheriff's sale at $16 million. (Def.'s Mot. for Summ. J. Ex. K [Deficiency J. Pet.].)

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a dispute of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). When the moving party does not bear the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Thereafter, the nonmoving party demonstrates a genuine issue of material fact if sufficient evidence is provided to allow a reasonable jury to find for it at trial. *Anderson*, 477 U.S. at 248. In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). Furthermore, a court may not make credibility determinations or weigh the evidence in making its determination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III. DISCUSSION

### A. Jurisdiction

The DJA states in relevant part:

> [T]he debtor, obligor, guarantor or any other person liable directly or indirectly to the judgment creditor for the payment of the debt, or any person interested in any real estate which would, except for the provisions of this section, be bound by the judgment, may file a petition, as a supplementary proceeding in the matter in which the judgment was entered, in the court having jurisdiction, setting forth the fact of the sale, and that no petition has been filed within the time limited by section 5522 to fix the fair market value of the property sold, whereupon the court, after notice as prescribed by general rule, and being satisfied of such facts, shall direct the clerk to mark the judgment satisfied, released and discharged.

42 PA. CONS. STAT. § 8103(d). Amalgamated argues that the Act's provision that a debtor seeking to complain that a judgment-creditor has not sought a judicial valuation of the property sold "may file a petition as a supplementary proceeding in the matter in which the judgment was entered, in the court having jurisdiction" establishes that the Philadelphia Court of Common Pleas (in which the initial judgment by confession was filed in June 2009) has exclusive jurisdiction over this action. The Court disagrees.

This Court has jurisdiction over Rimas's claims pursuant to 28 U.S.C. § 1332. It is undisputed that there is complete diversity of citizenship between the parties and that the amount in controversy exceeds $75,000. The Pennsylvania state legislature lacks the authority to strip this Court of jurisdiction bestowed upon the federal courts by Congress. *See Penn Gen. Cas. Co. v. Pennsylvania ex rel. Schnader*, 294 U.S. 189, 197 (1935) ("The jurisdiction conferred on the District Courts by the Constitution and laws of the United States cannot be affected by state legislation."); *Burtsell v. Toumpas*, Civ. A. No. 08-455, 2009 WL 1322594, at *4 (D.N.H. May 12, 2009) ("The premise of this argument, i.e., that state law impacts the subject-matter

jurisdiction of the federal courts, is fundamentally wrong." (citing *Pusey & Jones Co. v. Hanssen*, 261 U.S. 491, 498 (1923)). Federal courts have frequently entertained DJA claims. *E.g. Munoz v. Sovereign Bank*, Civ. A. No. 06-2876, 2006 WL 2707399 (E.D. Pa. Sept. 18, 2006) (jurisdiction based on diversity); *Resolution Trust Corp. v. Cosgrove*, Civ. A. No. 92-2809, 2001 WL 64777 (E.D. Pa. 2001); *United States v. Branch Coal Corp.*, 285 F. Supp. 514, 517 (E.D. Pa. 1968) (finding that federal court had jurisdiction to hear DJA claim stemming from 28 U.S.C. § 1345 because United States was plaintiff). Amalgamated seeks to distinguish these cases, saying that the issue of jurisdiction was not raised in those cases or that jurisdiction was "based on an express grant of jurisdiction," such as the Bankruptcy Code. (Def.'s Mot. for Summ. J. at 8.) This Court's jurisdiction over diversity cases is also an express grant of jurisdiction from a Congressional statute: 28 U.S.C. § 1332. Amalgamated has pointed this Court to no authority suggesting that the diversity jurisdiction should be treated differently than other grants of jurisdiction for purposes of the DJA. This Court has jurisdiction over this action pursuant to § 1332, and therefore has authority to issue a declaratory judgment. 28 U.S.C. § 2201; *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937).

  **B.**   **Deficiency Judgment Act**

    *1.*   *Legislative History*

Before the passage of the DJA, "the price at which the mortgaged property [was] sold by the Sheriff, even when purchased by the mortgagee for a nominal bid . . . [was] conclusive as to the value of the mortgaged property." PENNSYLVANIA LEGISLATIVE JOURNAL – HOUSE (June 9, 1941) [hereinafter, LEGISLATIVE JOURNAL – HOUSE] at 3434; *see Lomison v. Faust*, 23 A. 377 (Pa. 1892) (upholding creditor's right to purchase back real property at sheriff's auction for

5

nominal sum and still collect remainder of judgment less that sum, but criticizing this as "unconscionable" conduct). The Pennsylvania legislature recognized that during the Great Depression, prices realized at forced sales on foreclosed property were often much less than the price at which the property would be sold to a willing buyer by a willing seller. LEGISLATIVE JOURNAL – HOUSE at 3436. This trend brought "intensified public dissatisfaction" with the common law rule. *Id*. at 3435.

The Pennsylvania legislature responded by passing the Mortgage Deficiency Judgment Act in 1934, which provided in part that:

> Whenever any real property is sold on any execution on the foreclosure of any mortgage, or on a judgment entered on any obligations secured by mortgage, and the sum for which such property was sold is not sufficient to satisfy the debt, interest and costs, the plaintiff or use plaintiff shall, within six months after such sale, petition the court out of which such writ of execution issued to fix the fair value of the property sold.

*Beaver County Bldg. & Loan Ass'n v. Winowich*, 187 A. 481, 487–88 (Pa. 1936). However, the Pennsylvania Supreme Court struck down the act as an unconstitutional impairment of the obligation of contracts. *Id.* at 487–90.

Soon thereafter, however, a series of decisions by the United States Supreme Court suggested that deficiency judgment acts could withstand federal constitutional challenges. *See Honeyman v. Jacobs*, 306 U.S. 539, 542 (1939) (stating that "[t]he Legislature may modify, limit, or alter the remedy for enforcement of a contract without impairing its obligation" so long as it does not deny all remedy or seriously impair the value of that right (quoting *Richmond Mortg. & Loan Corp. v. Wachovia Bank & Trust Co.*, 300 U.S. 124, 128 (1937))); *Gelfert v. Nat'l City*

*Bank of New York*, 313 U.S. 221 (1941). In *Gelfert*, the United States Supreme Court held that New York's deficiency judgment statute withstood constitutional challenge. *Id.* at 233–34.

The Pennsylvania legislature in 1941 responded to this changing legal landscape by unanimously passing a new deficiency judgment act, which was "practically identical" to an amendment to the New York statute that the United States Supreme Court had found constitutional in *Gelfert*. LEGISLATIVE JOURNAL – HOUSE at 3436. The bill sought to keep foreclosure sales from becoming "an instrument of oppression" for mortgagees over mortgagors. *Id.* (quoting *Gelfert*, 313 U.S. at 232).

> The Pennsylvania Act in its current form states:
>
> Whenever any real property is sold, directly or indirectly, to the judgment creditor in execution proceedings and the price for which such property has been sold is not sufficient to satisfy the amount of the judgment, interest and costs and the judgment creditor seeks to collect the balance due on said judgment, interest and costs, the judgment creditor shall petition the court to fix the fair market value of the real property sold.

42 PA. CONS. STAT. § 8103(a). Furthermore:

> If the judgment creditor shall fail to present a petition to fix the fair market value of the real property sold within [six months], the debtor, obligor, guarantor or any other person liable directly or indirectly to the judgment creditor for the payment of the debt, or any person interested in any real estate which would, except for the provisions of this section, be bound by the judgment, may file a petition, as a supplementary proceeding in the matter in which the judgment was entered, in the court having jurisdiction, setting forth the fact of the sale, and that no petition has been filed within the time limited by section 5522 to fix the fair market value of the property sold, whereupon the court, after notice as prescribed by general rule, and being satisfied of such facts, shall direct the clerk to mark the judgment satisfied, released and discharged.

*Id.* § 8103(d); *see id.* § 5522(b)(2).

Rimas contends that their debt should be deemed satisfied because Amalgamated did not seek a deficiency judgment between the time they purchased the first and the second bundle of condominiums at the sheriff's auction. Rimas relies primarily on two cases to support their claim: *Union Trust Co. of New Castle v. Tutino*, 44 A.2d 556 (Pa. 1945); and *Munoz v. Sovereign Bank*, Civ. A. No. 06-2876, 2006 WL 2707399 (E.D. Pa. Sept. 18, 2006). In *Tutino*, the judgment-creditor executed against and purchased for $50 one of two properties that secured a mortgage. 44 A.2d at 557. The judgment-creditor never sought a declaratory judgment. *Id.* More than two years after executing against the first property, the judgment-creditor sought to execute against the second property and filed a "supplemental declaration" stating that it had credited $8500 towards the judgment-debtor's debt as a result of the first sale. *Id.* The judgment-debtor successfully petitioned for a stay and an order declaring the debt satisfied by virtue of the first sale. *Id.* at 557–58. The Supreme Court of Pennsylvania affirmed. *Id.* at 558.

Rimas emphasizes the following language from *Tutino*:

> If a mortgage includes more than one tract of land and the execution is against one tract only, and the plaintiff desires to proceed against other property belonging to the debtor, he must, within six months, apply to the court to fix the fair market value of the property sold and credit the judgment debt with that amount; if he does not do that, the debtor 'shall be released and discharged of such liability.' There is nothing in the Act to indicate that if a plaintiff elects to have execution against only part of the mortgaged property, he need not apply to the court to fix the value of the part sold; on the contrary, a construction to that effect is excluded by the requirement that he must have the value fixed whenever 'any' real property is sold.

> If, for example, a plaintiff has judgment entered on a judgment note, he may issue successive executions until he collects his debt out of various parcels of defendant's real estate. He need not include them all in the first execution. But if the first parcel is sold to him by the sheriff for less than enough to satisfy the judgment, he cannot have an alias writ against a second parcel unless he complies with the statute by having the fair value of the sold land fixed.

8

(Def.'s Mot. for Summ. J. at 18 (citing *Tutino*, 44 A.2d at 558).)

In *Munoz*, the judgment-debtors confessed a judgment of approximately $1.1 million based on a loan they failed to repay. 2006 WL 2707399, at *1. The judgment-creditor executed against judgment-debtors' commercial property and purchased it for $31,000, receiving the deed on September 24, 2005. *Id.* The judgment-debtors' residential property was then sold on January 31, 2006, pursuant to a judicial sale. *Id.* No deficiency judgment was sought before January 31, 2006. The judgment-creditor, which held a second mortgage on the residential property, received $587,000 from the judicial sale toward the satisfaction of its judgment against the judgment-debtors. *Id.* The judgment-creditor moved to dismiss the judgment-debtors' declaratory judgment lawsuit, arguing that it had not violated Pennsylvania's Declaratory Judgment Act because at the time the residential property was sold, the judgment-creditor still had two months to petition the court to fix the fair market value of the commercial property. *Id.* at *2. The court disagreed, saying:

> The six month period a creditor has to file a petition to fix fair market value under the Act does not give the creditor a six month window in which to undermine the protection the Act affords a debtor. The creditor during that period is not given carte blanche to collect the difference between the judgment and the price which the creditor paid at the sheriff's sale of the first property subject to foreclosure.

*Id.* (citing *Auerbach v. Corn Exch. Nat'l Bank & Trust Co.*, 148 F.2d 709, 712 (3d Cir. 1945); *Valley Trust Co. of Palmyra v. Lapitsky*, 488 A.2d 608, 611–12 (Pa. Super. Ct. 1985)).

*Tutino* and *Munoz* are distinguishable from the case at bar. In *Tutino* and *Munoz*, months or years elapsed between the judgment-creditor's first and second execution against judgment-debtor's property. In contrast, this case involves execution sales that occurred minutes apart on

9

the same day, during one sheriff's auction proceeding, and pursuant to a single praecipe for writs of execution. Despite Rimas's request that this Court look formalistically to the number of writs or the number of times the auctioneer's hammer fell, Amalgamated clearly sought to sell all of the 1352 South Street condominiums at a single sheriff's auction proceeding to collect funds to be applied towards Rimas's debt. Rimas does not argue that Amalgamated would have run afoul of the DJA had it auctioned all of the condominiums at once under one writ. *See Tutino*, 44 A.2d at 558 (indicating that judgment creditor can elect to execute against one tract of land or more than one tract at a given time). What Amalgamated did here—filing one praecipe for writs of execution and asking the Sheriff to auction all of the condominiums off serially in one auction proceeding—is functionally equivalent to executing against all of the condominiums via one writ and one request for bids. In both instances, the judgment-creditor's intention to execute against all of the judgment-debtor's collateral is obvious. If a judgment-creditor intends to execute against multiple pieces of a judgment-debtor's property simultaneously, the number of writs of execution filed is irrelevant to the DJA analysis. Rimas's argument that a judgment-creditor can never, in the absence of a deficiency judgment, prevail in two sales of a judgment-debtor's property on the same day elevates form over substance in a way that the legislature that passed the DJA most assuredly would not countenance.

The only difference from the judgment-debtor's standpoint between executing against all of the condominiums via one writ and executing against them via multiple writs on the same day and at the same auction proceeding is that the latter increases the probability that a party other than the judgment-creditor will bid on and purchase some of the condominiums. Far more parties will be able to bid upon one condominium (or one bloc of condominiums) than could put

in a serious bid on the entire condominium complex. The DJA should not be read so as to require a judgment-creditor to execute against loan collateral in such a way that the property executed against will be too large and expensive to draw third-party bids. To do so would be to render the sheriff's sale process a charade, leading inevitably to a purchase by the judgment-creditor for a nominal sum and a *post-facto* determination of value by a court. Furthermore, by making it less likely that outsiders will bid on the seized collateral, Rimas's interpretation of the DJA would make it more likely that courts, rather than markets, would be called upon to determine market prices. In contrast, Amalgamated's reading of the statute would draw more bidders to sheriff's auctions, thus making it more likely that judgment-debtors would see an immediate reduction in their debt and not have to submit to a slow, costly, and uncertain judicial determination of the property's fair market value.

Rimas's interpretation of the statute would lead to absurd results. According to Rimas, if Amalgamated wanted to sell individual condominiums or blocs of condominiums, the appropriate procedure would be to sell one condominium or bloc of condominiums, then petition a court for a determination of the fair market value of the property it purchased, wait for the court to fix a value, apply that amount to reduce the judgment-debtor's debt, and then start the process all over. Pennsylvania requires at least thirty days notice prior to a sheriff's sale and provides twenty days to respond to a petition to fix the amount of the deficiency judgment. PA. R. CIV. P. 3129.2(b) & (c); PA. R. CIV. P. 3280(a). Rimas's interpretation of the DJA would mean that only a few condominiums could be sold this way in a year and thus the sale at sheriff's auction of individual condominiums from a building with many units could take decades. This Court presumes that the General Assembly of Pennsylvania did not intend by its legislation to create

absurd results. 1 Pa. Cons. Stat. § 1922(1). Common sense forecloses the absurd statutory reading Rimas requests.

## IV. CONCLUSION

Based on a review of the statute and the history from which it arose, this Court holds that the DJA cannot operate to give Rimas the result they seek here. The DJA was designed to protect debtors against creditors' attempts to extract extra payment from them, not to "provide loopholes to a mortgagor to escape an obligation assumed by him." *Catholic Women's Benevolent Legion v. Burke*, 253 A.D. 261, 264 (N.Y. App. Div. 1938). For the reasons stated above, the Court grants Amalgamated's motion for summary judgment. An appropriate Order will be docketed separately.